# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| PATRICIA M. KEPPLER, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No. 12-10768-FDS |
| RBS CITIZENS N.A., | ) ) ) | |
| Defendant. | ) ) ) | |

# MEMORANDUM AND ORDER ON
# DEFENDANT'S MOTION TO STRIKE

**SAYLOR, J.**

This is a banking law dispute arising out of a series of transfers of stolen funds. Plaintiff Patricia Keppler was, apparently, a victim of a fraud involving one or more persons in Ghana, who persuaded her to allow the use of her bank accounts to launder and transfer funds, using her home-equity line of credit account. She has brought suit against defendant RBS Citizens, N.A., contending that it illegally charged her for losses to her account.

Defendant has moved to strike the testimony of plaintiff's expert, Marie Kerr, under Fed. R. Evid. 702 and the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). For the following reasons, the motion will be granted in part and denied in part.

I.   **Background**

   A.   **Factual Background**

   1.   **Keppler's Financial Transfers**

In 2005, Patricia Keppler opened a home-equity line of credit account ("HELOC account") with RBS Citizens, N.A. The HELOC account provided her a line of credit up to $200,000, secured by an "open end" mortgage on a property in Barnstable County, Massachusetts. (*See* Manufacturing Issue Reporting & Escalation for Business Units, Docket No. 72, Ex. 4) ("Fraud Report"). Keppler also had a personal checking account with Citizens. (*See id.*).

In 2010, Keppler apparently became involved in an online "romance fraud" with one or more persons from Ghana. (*See* Keppler Dep. at 14-18). At some point, she gave her personal identifying and banking information to those persons, who were otherwise strangers to her. (Keppler Dep. at 71-74).[1] Between December 23, 2010, and January 11, 2011, fifteen transfers of funds were made from an account at Citibank into Keppler's HELOC account. (Compl. ¶ 15).[2] Keppler did not make those transfers.

The apparent purpose of the arrangement, from the standpoint of the Ghanaian perpetrators, was to launder stolen funds. (*See, e.g.*, *id.* at 14-18, 28, 34, 36-37, 46-47). The scheme was that stolen money would be transferred into Keppler's HELOC account. (*See id.*). She would then draw on the HELOC account and deposit the funds in her checking account at

---

[1] According to defendants, Keppler agreed to the arrangement even though she had previously reported that her Ghanaian online contact had defrauded her. (*See* Keppler Dep. at 81-82).

[2] Because neither party has provided evidence concerning the transactions alleged in the complaint or provided an alternate description of them, the Court assumes the description in the complaint is true.

2

Citizens. (*See id.*). She would then wire the money to a bank account in Ghana. (*See id.*).

The transfers to the HELOC account were made through Citizens's automated telephone system, which permits customers to transfer money from other bank accounts to their Citizens banks accounts by telephone. (Kerr Dep. at 63-64).[3] To use the system, a customer calls the automated system's telephone number and provides a Citizens billing-account number. (Meyer Dep. at 45-46). The customer must then enter a security code chosen by Citizens; the code is often a zip code or the last four digits of the customer's social security number. (*Id.* at 45-47). The customer provides the billing and routing numbers of the account the money is to be paid from, the amount of the payment, and the payment date. (*Id.* at 47-48). After receipt of the proper information, the system will automatically transfer the requested money into the account. (*See id.* at 48-50).

The system uses an electronic funds transfer network known as the Automated Clearing House ("ACH"). (Meyer Dep. at 31). The ACH network is governed by rules promulgated by the Electronic Payments Association ("NACHA"). (*See* 2011 NACHA Operating Rules, Docket No. 72, Ex. 20 at 2).[4]

Between December 24, 2010, and January 11, 2011, someone transferred a total of $289,732 from an account at Citibank into Keppler's HELOC account. (Compl. ¶ 15). Keppler then transferred a total of $280,136.30 from her HELOC account into her personal checking

---

[3] Both parties have provided different excerpts of the depositions in this case in different exhibits. (*See, e.g.*, Kerr Dep. Docket No. 66, Ex. B, Docket No. 72, Ex. 14; Meyer Dep., Docket No. 66, Ex. C; Docket No. 72, Ex. 8; Jacob Dep., Docket No. 66, Ex. D Docket No. 72, Ex. 9; Keppler Dep., Docket No. 66, Ex. E, Docket No. 72, Ex. 14; DeLuca Dep., Docket No. 72, Ex. 2). Citations to those depositions will therefore include only the page numbers.

[4] The Electronic Payments Association was formerly known as the National Automated Clearing House Association.

3

account. (*Id.*). She then made three wire transfers from her checking account to a bank account in Ghana totaling $165,000. (*Id.*).[5]

In January 2011, the Citibank customer from whose account the funds had been drawn reported that the transactions were unauthorized—in other words, that the money had been stolen. (DeLuca Dep., Ex. 23). Citizens notified Keppler that the bank suspected fraud. (Compl. ¶ 17). It blocked the HELOC account from originating any further transactions. (DeLuca Dep. at 72-77). It also froze Keppler's personal checking account. (*Id.* at 25).

Citizens reversed the payments and sent funds back to Citibank. (Meyer Dep. at 90). The transfers to Ghana could not, however, be reversed. As a result, Citizens faced approximately $219,000 in losses. (*See* Fraud Report). After Keppler refused to refinance the mortgage on her property to cover the losses, Citizens charged the loss to her account by adding it to the principal of her loan. (*See* e-mails, Docket No. 72, Exs. 5-7).

Keppler contends that the fifteen payments into her HELOC account were unauthorized because she did not initiate them. She also contends that Citizens illegally charged her for the losses because it did not more quickly identify and respond to the fraudulent activity. Citizens contends, among other things, that Keppler authorized those transfers by giving her personal identifying and banking information to the individuals who did initiate the transfers, and therefore bears responsibility for the losses.

### 2. **Marie Kerr's Testimony**

Marie Kerr is the president and founder of Shamrock Consulting Group, a professional consulting firm in the field of money laundering and financial crime. (Kerr Report, Docket No.

---

[5] She also wrote a personal check in the amount of $5,000 payable to "cash," which she used to send funds to Ghana by a money transfer. (Compl. ¶ 15).

72, Ex. 1 at 2). According to Kerr, Shamrock provides consulting services to a wide range of clients on implementation and enhancement of anti-fraud software systems, forensic financial analysis, and risk-management procedures. (*Id.*).

Kerr has worked in the banking industry for more than thirty years, primarily in the area of designing and developing systems for monitoring electronic banking transactions to detect fraud and financial crime. (Kerr Aff. ¶ 2). She earned a Bachelor of Science in economics from Cornell University and attended one year of classes in the graduate school of management at Northwestern University. (Kerr Report at 22; Kerr Aff. ¶ 8).

Kerr is a Certified Financial Crime Specialist, a certification earned from the Association of Certified Financial Crime Specialists that requires training in detecting and dealing with financial crime. (Kerr Report at 22). She also was a Certified Anti-Money Laundering Specialist, but allowed her certification to lapse in 2012. (Kerr Aff. at 10). Kerr is not an Accredited ACH Professional, a certification provided by NACHA that requires training in ACH transactions. (Kerr Dep. at 25).

In her expert report, Kerr opined that Citizens failed to comply with the NACHA Operating Rules concerning the fifteen payments into Keppler's account and should not have allowed them to occur. (Kerr Report at 17). She also concluded that Citizens's authentication procedures for verifying the identity of an individual who is transferring money into a HELOC account over the telephone were commercially unreasonable. (*Id.*). Finally, she concludes that Citizens's fraud detection, risk mitigation, and regulatory compliance procedures were insufficient. (*Id.*).

B.      **Procedural Background**

Plaintiff filed the complaint in this case on April 30, 2012.  As set forth below, the complaint contains six counts, none of which are labeled, and some of which do not set forth the underlying legal theory on which the claim is based.

Defendant has moved to strike the report and testimony of Marie Kerr.

**II.      Standard of Review**

Whether expert testimony may be admitted is governed principally by Rule 702 of the Federal Rules of Evidence.  The adoption of Rule 702 in its present form codified the standard of admissibility for expert testimony that was set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *United States v. Diaz*, 300 F.3d 66, 72 (1st Cir. 2002).

Under Rule 702, district courts considering the admissibility of scientific testimony must "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (quoting *Daubert*, 509 U.S. at 597).  This gatekeeping function requires that the Court consider three issues:  (1) whether the proposed expert is qualified by "knowledge, skill, experience, training, or education"; (2) whether the subject matter of the proposed testimony properly concerns "scientific, technical, or other specialized knowledge"; and (3) "whether the testimony [will be] helpful to the trier of fact, i.e., whether it rests on a reliable foundation and is relevant to the facts of the case."  *Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir. 1996).

The requirement that an expert's testimony must be based on a reliable foundation is often the "central focus of a *Daubert* inquiry."  *Ruiz-Troche*, 161 F.3d at 81.  That requirement

ensures that "the reasoning or methodology underlying the testimony is . . . valid" and that the "reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. In evaluating whether expert testimony will be helpful to the trier of fact, the court must also determine whether it is relevant, "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche*, 161 F.3d at 81 (citing *Daubert*, 509 U.S. at 591-92). In other words, Rule 702 requires the court to "ensure that there is an adequate fit between the expert's methods and his conclusions." *Samaan*, 670 F.3d at 32 (citing *Daubert*, 509 U.S. at 591); *see also Cipollone v. Yale Indus. Prods., Inc.*, 202 F.3d 376, 380 (1st Cir. 2000) (describing the "ultimate purpose of the Daubert inquiry" as determining the testimony's helpfulness to the jury).

Significant analytical gaps between the data and the opinion proffered by an expert may undermine the reliability of an expert's testimony. *See General Elec. Co. v. Joiner*, 522 U.S. 126, 146 (1997). A court may choose to exclude an expert's opinion when it is "based on conjecture or speculation from an insufficient evidentiary foundation," *Damon v. Sun Co.*, 87 F.3d 1467, 1474 (1st Cir. 1996) (internal quotations omitted), or when it is "connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co.*, 522 U.S. at 146.

However, the focus of the Rule 702 inquiry is on the principles and methodology employed by the expert, not the ultimate conclusions. *Daubert*, 509 U.S. at 595. The court may not subvert the role of the fact-finder in assessing credibility or in weighing conflicting expert opinions. Rather, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky

7

but admissible evidence." *Id.* at 596; *see also Ruiz-Troche*, 161 F.3d at 85 (admitting testimony notwithstanding a lack of peer-reviewed publications because the opinion rested upon good grounds generally and should be tested by the "adversarial process").

## III.    Analysis

Whether expert testimony is admissible depends, in no small part, on the nature of the claims or defenses it is intended to support or rebut. In this case, the amorphous nature of plaintiff's claims makes it difficult to ascertain whether the proposed expert testimony is even relevant. The complaint asserts six counts, none which bear any identifying label, and some of which do not appear to state any cognizable claim at all.

Count I refers to Article 4A of the Uniform Commercial Code, Mass. Gen. Laws ch. 106, § 4A-101 *et seq.*, but it does not purport to state a claim under that statute. Instead, it alleges that plaintiff was "entitled to rely on a credit posted to her account by a funds transfer" (that is, the funds coming into her HELOC account); that but for those credits she "would not have made the subsequent transfers" out of the account; that Citizens had "no authority to refund the originating bank . . . and then charge [plaintiff]"; that she "did not make any warranties in connection with her receipt of the incoming funds transfers"; and that Citizen "erred" by charging her HELOC account with the amounts paid to the originating bank. (Compl. ¶¶ 38-39). It identifies no specific cause of action, nor any specific statutory, regulatory, common-law, or contractual duty or right alleged to have been violated by the bank.

Counts II is even more cryptic. It simply alleges that Citizens has been charging plaintiff interest on the entire balance of her HELOC account since the events in question, and that payments made by plaintiff since May 2011 should be credited to the correct (lower) interest

amount and any balance applied to the principal. (Compl. ¶ 43-44). Again, no specific cause of action is identified.

Count III appears to claim a breach of contract. It alleges that "based on an incorrect principal balance, Citizens has encumbered the property by asserting a security interest in the property, in excess of the Credit Limit under the Loan Agreement and Mortgage and in breach of the Loan Agreement and Mortgage." (Compl. ¶ 46).

Count IV seems to allege a claim for negligence, although it does not use the word. In substance, it alleges that Citizens "owed a legal duty [to plaintiff] to detect suspicious banking activity" and that it breached that duty, causing plaintiff to sustain damages. (Compl. ¶ 48, 54).

Count V likewise seems to allege a claim for negligence, in that it alleges a duty, a breach, causation, and injury. It alleges that Citizens advised plaintiff that "Keppler, or someone possessing 'private and confidential information known only to Keppler' authorized and originated the ACH debits to be made into Keppler's HELOC account"; that she had "no knowledge" that the incoming transfers were "'ACH debits' or that they had allegedly been made subject to the NACHA Rules with accompanying warranties by her"; that she "had no knowledge that her account had been set up to send or receive ACH debits"; that she "never agreed to be bound by the NACHA Rules or agreed to give any warranty thereunder"; that "Citizens' security procedures in place to protect Keppler's account were either unreasonable and insufficient or not followed by Citizens"; and that "[i]f the fifteen incoming funds transfers were ACH debits as Citizens has stated, then Citizens owed an breached a legal duty to Keppler to guard her account a breach of her account security." (Compl. ¶¶ 56-60).

Finally, Count VI alleges a violation of Mass. Gen. Laws. Ch. 93A, § 2.

9

It is against that backdrop that the relevance and admissibility of Kerr's testimony must be determined. As noted, she intends to offer the following opinions: (1) that Citizens failed to comply with the NACHA Operating Rules; (2) that Citizens's authentication procedures for verifying the identity of an individual who is transferring money into a HELOC account over the telephone were commercially unreasonable; and (3) that Citizens's fraud detection, risk mitigation, and regulatory compliance procedures were insufficient.

### A. Testimony Concerning the NACHA Rules

The first question is whether Kerr can testify concerning the NACHA Operating Rules and whether Citizens complied with those rules. It is unclear whether that testimony concerns an affirmative claim asserted by plaintiff (for example, that Citizens is liable to plaintiff because it violated NACHA rules) or a defense asserted by Citizens (that it cannot be liable because it followed those rules). Nonetheless, both sides seem to agree that the subject matter itself is relevant. Citizens instead seeks to strike Kerr's testimony on the grounds that she is not qualified to opine on the subject and her methodology is unsound.

#### 1. Kerr's Experience with the NACHA Rules

Citizens first argues that Kerr is not qualified to opine on whether the fifteen payments into plaintiff's HELOC account conformed with the NACHA rules. "Fed. R. Evid. 702 mandates that a putative expert be qualified to testify by knowledge, skill, training, or education. . . . Under this rule, a testifying expert 'should have achieved a meaningful threshold of expertise' in the given area." *Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) (citing *Prado Alvarez v. R.J. Reynolds Tobacco Co.*, 405 F.3d 36, 40 (1st Cir. 2005)). Defendant contends that Kerr is not qualified to testify on its compliance with the NACHA rules because

10

she has not had sufficient education or experience in analyzing ACH transactions or compliance with NACHA rules, and because this is the first time she has analyzed ACH transactions to see if they complied with those rules. (*See* Kerr Dep. at 31-32).

According to Kerr, she has worked in the banking industry for more than thirty years. (Kerr Aff. ¶ 2). She has primarily focused on how electronic payment systems work, and has experience in designing and developing systems, algorithms, and processes to detect fraudulent transactions. (*Id.*). As a result, she contends that she has experience in how banks process ACH transactions and the security protocols commonly employed by banks when processing such transactions. (*Id.*). She also has specific knowledge of the NACHA rules from implementing systems that process ACH transactions, creating programs that handle the consequences of improper ACH transactions, and designing analytic algorithms to detect financial crime and fraud within ACH transactions. (*Id.* ¶ 3). She acknowledges that she does not have an AAP certification and has not previously analyzed specific ACH transactions to see if they complied with the NACHA rules. (Kerr Dep. at 25, 31-32).

Kerr's lack of formal training does not require the exclusion of her testimony if she has experience that allows her to identify which rules apply and how they operate. *See United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006) ("It is not required that experts be blue-ribbon practitioners with optional certifications."). Defendant contends that Kerr only has general knowledge of the NACHA rules "in the limited context of implementing and developing . . . fraud prevention software as an [information technology] professional." (Pl. Reply at 4). It is true that her focus is on preventing financial crime. (*See* Kerr Report at 2-3). However, she claims a knowledge of NACHA rules based on her experience in creating software that processes

11

ACH transactions. (*See* Kerr Aff. ¶ 3).

Thus, even if her professional focus is on preventing money laundering and other types of fraud, her experience in implementing and working with systems that handle ACH and other electronic payment transactions—while perhaps thin—is sufficient to provide a basis for expert testimony. *See Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion*, 345 F.3d 15, 24-25 (1st Cir. 2003) (noting that "it would have been an abuse of discretion for the court to exclude [the expert's] testimony on the sole basis that his medical specialty was something other than gynecology or obstetrics," the relevant medical specialties in the case). Her relative lack of formal qualifications is, of course, an appropriate basis for cross-examination.

Accordingly, the Court finds that Kerr is not disqualified to opine as to whether the ACH transactions complied with the NACHA rules.

### 2. Reliability of the Testimony

Defendant contends that Kerr's methodology in analyzing the ACH transactions is based on an unreliable foundation for two reasons. First, it contends that Kerr used the wrong version of the NACHA rules to conduct her analysis. During her deposition, Kerr said she used the 2010 and 2013 versions of the NACHA rules in analyzing the fifteen payments in this case. (Kerr Dep. at 57-58). Defendant contends that the 2011 NACHA rules apply to the payments in this case, and that there were significant changes to the rules between 2010 and 2011. Plaintiff contends that at least some of the payments were covered by the 2010 rules. She further contends that there is no substantive and relevant difference between the 2010 and 2011 rules

The 2011 NACHA rules became effective on January 1, 2011. (2011 NACHA Rules, Docket No. 72, Ex. 20 at 2). Before that time, the 2010 Rules were in effect. (Notice of

Amendment to the 2010 ACH Rules, Docket No. 72, Ex. 16, at 4). Six of the fifteen payments into plaintiff's HELOC account were made in December 2010. (Compl. ¶ 15). Accordingly, the first six payments were covered by the 2010 rules. Kerr's use of those rules in analyzing the first six transactions does not appear to be inappropriate.

The final nine transactions were made in January 2011, and are therefore governed by the 2011 Rules. (Compl. ¶ 15).[6] Defendant contends that Kerr's conclusions as to those transactions are unreliable. Although the 2011 rules are structured differently than the 2010 rules, almost all of the changes were a simplification of the rules designed to make them easier to understand. (Notice of Amendment at 4). The substantive meaning of the rules was not altered by the changes. (*Id.*); *see also PFG Precious Metals, Inc. v. SunTrust Bank*, 2012 WL 401487, at *2 (N.D. Ill. Feb. 7, 2012) ("Although the numbering of the NACHA rules differed between 2010 and 2011, the relevant rules are substantially the same . . . ."). Defendant has not identified any substantive difference between the 2010 and 2011 rules that is relevant to the transactions in this case. Therefore, even if Kerr did not refer to the 2011 rules when analyzing these transfers, her conclusions might still be reliable if there were no substantive changes in the rules between 2010 and 2011.

Second, defendant contends that Kerr's report is unreliable because it is based on two false premises. The first is the premise that every ACH transaction requires a customer authorization. (*See* Kerr Report at 9). Defendant contends that some transfers do not require authorization, pointing to 2010 NACHA Rule 2.1.3, which states that "no authorization by the [r]eceiver is required for credit entries" if both the originator and the receiver of the ACH

---

[6] Plaintiff contends that even though Kerr testified in her deposition that she could not recall referring to the 2011 rules during her analysis of the payments, she did in fact refer to them. (Kerr Aff. ¶ 4).

13

transaction are "natural persons." (2010 NACHA Rule 2.1.3, Docket No. 66, Ex. J).[7] Plaintiff contends that the transactions here required authorization because they were not between natural persons; defendant contends that the account from which the payments were sent was a commercial account with Citibank and not an account owned by a natural person. (*See* 2011 NACHA Rule 2.3.1, Docket No. 66, Ex. H (explaining the general rule that authorization must be obtained for an ACH transaction)). According to the NACHA rules, whether authorization is required depends on the nature of the originator and the receiver. (*See id.*; 2010 NACHA Rule 2.1.3 (noting it is an exception to the authorization requirement)).[8] Accordingly, Kerr will not be allowed to opine that authorization is required in *every* case, but will be allowed to give her opinion as to whether authorization was required for these specific transactions.

Defendant next contends that Kerr improperly faults it for allowing the fifteen payments to plaintiff's HELOC account because that conclusion is premised on the assumption that defendant discovered or could have discovered what type of account the payments were drawn from. As explained above, certain credit entries between natural persons do not require authorization, while other transactions do require authorization. (2010 NACHA Rule 2.1.3). Defendant further contends that because it could not know if the account was held by a commercial entity rather than a natural person, it could not know whether the transaction needed to be authorized by that entity. (*See* Kerr Dep. at 111).

According to plaintiff, the NACHA rules distinguish between credit and debit entries. In a credit entry, one party initiates a payment to another party. In a debit entry, one party initiates

---

[7] Defendant also contends that the same rule is outlined in Rule 2.3.2.1 of the 2011 NACHA rules, but has not submitted that portion of the 2011 rules to the Court.

[8] According to defendant, it has no way to determine the nature of the account at the other bank, and no obligation under NACHA rules to determine whether that account was held by a business or an individual.

a payment to itself from another party. NACHA Rule 2.1.3 states that "[i]f both the [o]riginator and [r]eceiver are natural persons, no authorization by the [r]eceiver is required *for credit entries*, and no warranty with respect to that authorization is made by the [originating bank]." (NACHA Rule 2.1.3) (emphasis added). Practically speaking, the rule means that when one party sends a payment to another party, the party receiving payment does not have to authorize the transaction. In contrast, in situations where a party initiates a payment from another party to itself, the party being charged does have to authorize the transaction. According to Kerr, the transactions in this case did require authorization because they were debit entries. (*See* Kerr Report at 9 (noting that the outside account was debited in these transactions)). Under the NACHA rules, debit entries require authorization.

Kerr's analysis, of course, is predicated on the showing a proper factual predicate. If the facts shown at trial establish that the transactions did not need to be authorized under 2010 NACHA Rule 2.1.3 (or the appropriate 2011 counterpart), or that defendant was not responsible for knowing if those transactions needed to be authorized, Kerr's conclusion that defendant was at fault for allowing those transactions, as a matter of NACHA rule interpretation, would be erroneous. However, that is no reason to exclude her testimony. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof [would be] the traditional and appropriate means of attacking" Kerr's opinion in those circumstances. *Daubert*, 506 U.S. at 596; *see also Milward v. Acuity Specialty Products Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011). Accordingly, defendant's motion will be denied as to Kerr's opinion on whether it complied with the NACHA rules in allowing the fifteen payments into plaintiff's HELOC account.

B.  **Whether Citizens Had Commercially Reasonable Security Measures**

Kerr also seeks to opine on the question of whether the bank's security measures concerning the automated telephone system were "commercially reasonable." The threshold question here is whether that issue is relevant to any claim asserted by plaintiff in this case (or defense asserted by Citizens).

1.  **Uniform Commercial Code Article 4A**

First, plaintiff contends that under *Patco Const Co., Inc. v. People's United Bank*, 684 F.3d 197 (1st Cir. 2012), the commercial reasonableness of a bank's security measures is relevant to whether the bank should be responsible for losses to a customer.

In *Patco*, unknown third parties initiated unauthorized withdrawals from a company's account. 684 F.3d at 205. The company sued its bank, contending that the bank's security measures violated Article 4A of the Uniform Commercial Code. *Id.* at 206.[9] Article 4A allows a bank to shift the risk of loss to the customer, even if the payment order is unauthorized, if the bank used commercially reasonable methods of providing security against unauthorized payment orders. *Id.* at 208 (citing Me. Rev. Stat. tit. 11, § 4-1202(2)).[10] The *Patco* court found that the bank's security procedures were commercially unreasonable, and therefore that the bank could be open to liability under Article 4A. *Id.* at 213.

The relevance, however, of Article 4A to this case is far from clear. The complaint does

---

[9] Massachusetts has adopted Article 4A. *See* Mass. Gen. Laws ch. 106, § 4A.

[10] Specifically, under the statute, "if a bank and its customer have agreed that the authenticity of a payment order issued to the bank in the name of the customer or sender will be verified pursuant to a security procedure," the payment order is effective, "whether or not authorized, if (i) the security procedure is a commercially reasonable method of providing security against an unauthorized payment order, and (ii) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement . . . [with the] customer." Mass. Gen. Laws ch. 106, § 4A-202(b).

16

not assert a claim under the statute. Kerr's opinion says nothing on the subject. And Citizens contends that Article 4A is inapplicable. It would appear, therefore, that Article 4A, and the *Patco* case, are irrelevant to this matter.[11]

## 2. Other Legal Theories

If the commercial reasonableness of the bank's security measures is relevant to any other claim in this case (putting aside for the moment the claim under Chapter 93A), that relevance is not made clear in either the complaint or plaintiff's memorandum. Although two counts of the complaint employ the language of negligence (duty, breach, causation, injury), any claim for negligence would surely be barred by the economic-loss doctrine. *See, e.g.*, *FMR Corp. v. Boston Edison Co.*, 415 Mass. 393, 395 (1993) ("[P]urely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage."). No other type of tort claim is set out in the complaint. Although Count III alleges a breach of contract, plaintiff points to no relevant contract or contractual language that might bear on the obligations

---

[11] This is perhaps because of the wording of the statute. Under Article 4A, a "payment order" is defined to include "an instruction of a sender to a receiving bank . . . to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if . . . such receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender." Mass. Gen. Laws ch. 106, § 4A-103(a)(1)(ii). The purpose of defining a "payment order" in this way "is to include credit transfers in Article 4A and to exclude debit transfers." Mass. Gen. Laws. Ch. 106, § 4A-104 cmt. 4. "In a credit transfer the instruction to pay is given by the person making payment. In a debit transfer the instruction to pay is given by the person receiving payment." *Id.* In *Patco*, the transactions were credit transfers, and therefore were payment orders covered by Article 4A, because the company (the party giving the transfer instruction) was the party making payment. *See Patco*, 684 F.3d at 204-05.

In this case, however, money was deposited *into* plaintiff's HELOC account from an outside account and the payment was initiated by a request from plaintiff's account. Plaintiff's account was, therefore, the account giving the instruction to pay *and* the account receiving payment. That means the deposits in this case were not credit transfers, but debit transfers. (*See* Kerr Report at 9 ("The transactions were ACH [d]ebits, meaning that the [r]eceiver's account was *debited* and Ms. Keppler's accounts were *credited*.") (emphasis in original); Jacob Dep. at 52-53). Accordingly, they do not appear to implicate the commercial reasonableness standard of Article 4A because they were not "payment orders" as defined by the statute. *See* Mass. Gen. Laws ch. 106, § 4A-104 cmt. 4 ("If [the transfer] is in the form of a debit transfer it is not governed by Article 4A."); *see also Grabowski v. Bank of Boston*, 997 F. Supp. 111, 121-122 (D. Mass. 1997) ("[A]rticle 4A does not apply to 'debit transfers.'") (citing Mass. Gen. Laws ch. 106, § 4A-104 cmt. 4).

17

of the parties. And the complaint does not allege any specific theory of recovery under any statute or regulation. Plaintiff has the burden of showing that Kerr's testimony is relevant. At this point, she has failed to do so. If the testimony is not relevant to some claim or defense asserted in the case, it should be struck.

As to the claim under Chapter 93A, the Court will defer making a decision at this time. Because there is no right to a jury trial for such claims, the question can be deferred until later in the litigation—at a minimum, until the nature of plaintiff's claims is made clear. *See Nei v. Burley*, 388 Mass. 307, 315 (1983) ("[T]here is no right to a trial by jury for actions cognizable under [Mass. Gen. Laws ch.] 93A."); *see also Wallace Motor Sales, Inc. v. American Motors Sales Corp.*, 780 F.2d 1049, 1067 (1st Cir. 1985) (holding that Chapter 93A claims are not "'suits at common law' entitled to a jury trial" under the Seventh Amendment). Furthermore, the obligations and rights of banks and their customers is an area of considerable complexity, governed by a variety of rules from a variety of sources. The application of Chapter 93A in such an area should be undertaken, if at all, with considerable caution, and only after development of a complete record. Certainly the Court will not assume that Chapter 93A simply trumps any other law or rule governing banking relationships.

### C. Whether Citizens Had Adequate Fraud Detection Systems

Kerr's opinion as to whether Citizens had adequate fraud detection systems suffers from similar problems. The federal banking laws on which she relies are the Bank Secrecy Act, 31 U.S.C. § 5311, and the USA PATRIOT Act of 2011, Pub. L. No. 107-56, 115 Stat. 272 (codified in scattered sections of the U.S.C.). Those statutes grant the Secretary of the Treasury the authority to require banks to report certain kinds of transactions to the certain governmental authorities. 31 U.S.C. § 5313(a). According to Kerr's report, banks set up reporting structures

18

to comply with these mandates. (Kerr Report at 15).

Defendant contends that Kerr cannot opine as to whether it had adequate fraud-detection systems because her conclusions are based on duties arising from federal banking laws that do not provide a private cause of action. *See Public Serv. Co. of Okla. v. A Plus, Inc.*, 1011 WL 3329181, at *8 (W.D. Okla. Aug. 2, 2011). Defendant further contends that its only legal duty was to file a suspicious activity report, the existence of which is privileged. Courts have routinely held that individuals do not have a private cause of action under the BSA if they suffer harm from a bank's failure to comply with the statute's requirements. *See, e.g.*, *Martinez Colon v. Santander Nat. Bank*, 4 F. Supp. 2d 53, 57 (D.P.R. 1998). Plaintiff responds that whether defendant knew the transactions were suspicious is relevant, not because she is bringing suit against defendant for violating the BSA or PATRIOT Act reporting requirements, but because a bank with proper BSA detection systems would not have allowed the fifteen incoming payments into her HELOC account.

Again, it is entirely unclear what legal theory plaintiff is employing in order to establish liability on the part of the bank, and how the proposed testimony fits within that theory. Plaintiff cannot simply offer testimony that the bank should have had better systems for detecting fraud without some indication as to why that testimony is relevant to some legally cognizable claim (or in response to a legally cognizable defense). In the absence of a showing of legal relevance, the motion to strike will be granted. The Court will again defer ruling on the issue to the extent that it relates to the claim under Chapter 93A.

## VI. <u>Conclusion</u>

For the foregoing reasons, defendant's motion to strike is (1) DENIED as to Marie Kerr's opinions concerning defendant's compliance with NACHA rules; (2) GRANTED as to her

19

opinions concerning the commercial reasonableness of defendant's security measures, except as to the claims arising under Mass. Gen. Laws ch. 93A; (3) GRANTED as to her opinions concerning the adequacy of defendant's fraud detection systems, risk mitigation, and regulatory compliance procedures, except as to the claims arising under Mass. Gen. Laws ch. 93A; and (4) DENIED without prejudice to its renewal as to the claims arising under Mass. Gen. Laws ch. 93A.

**So Ordered.**

                                                          /s/ F. Dennis Saylor
                                                         F. Dennis Saylor IV
Dated: June 24, 2014                                    United States District Judge